## W. A. SNOW IRON WORKS, INCORPORATED, *vs.* LEONARD B. CHADWICK & others.

Suffolk.    March 20, 1917. — June 9, 1917.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & PIERCE, JJ.

*Unlawful Interference. Strike. Labor Union. Equity Pleading and Practice,* Master's report, Appeal, Bill, Decree. *Agency. Custom. Damages,* In equity. *Contract,* What constitutes, Implied.

A corporation, engaged in the manufacture and installation of wrought iron work and having a contract to supply such iron work for a building, may maintain a suit in equity to enjoin the officers and members of a labor union from causing a strike of the union men employed by it in the performance of the contract for the purpose of compelling the corporation to sign an agreement which "would have required it to unionize its outside work," that is, the work done by it outside its own shop.

Where in a suit in equity the defendants did not appeal from an interlocutory decree, which sustained certain of their exceptions to a master's report and otherwise confirmed the report, none of their overruled exceptions to the master's report are open to them upon an appeal by them from the final decree.

The scope of a bill in equity cannot be enlarged by the prayers for relief.

In a suit in equity to restrain the officers and members of a labor union from unlawful interference with the plaintiff's performance of a contract, where it appeared that the plaintiff was entitled to an injunction, and where on the question of damages the plaintiff contended that there was an implied agreement whereby the union understood and constructively agreed that it would furnish union labor for the plaintiff on outside work, it was *held* that a finding of the trial judge was warranted that no such implied agreement existed, and it was *said* that the officers of the union could not create either by word or conduct a binding bargain in behalf of the members of their union to furnish labor to be performed individually, unless they had been authorized expressly or impliedly by the members to make such an agreement in their behalf.

In the same connection it was *said* that a "custom and practice" of furnishing men whenever the plaintiff communicated its needs to the responsible officers of the union directly or through one of the plaintiff's foremen who was a member of the union, even if known to the members of the union and never formally disapproved, could not be found to be a contract for a breach of which damages could be recovered or which could be enforced in equity.

In the same case it was *said* that a finding of the master was right which denied to the plaintiff damages for its loss of profits on eleven contracts that the plaintiff would have taken if its amicable relations with the union had continued, as the members of the union lawfully could refuse of their own volition to work for the plaintiff.

In the same case it was *held,* that a "shop loss" occasioned by the loss of the eleven contracts not taken by the plaintiff could not be recovered.

In the same case it appeared that a substantial amount of "shop loss," which was found by the master, included besides the shop loss on the eleven lost contracts the actual shop loss occasioned by the defendants' unlawful interference with the plaintiff's existing contract but that it could not be ascertained from the master's report how much of such loss was occasioned by the stopping of work on the existing contract, and it was *held,* that, if the plaintiff had wished to have damages assessed for this part of the loss, it should have moved for a recommittal of the report to the master.

In the case above described it was contended that the decree should contain a clause forbidding the imposition of fines and penalties as a mode of enforcing the purpose of the defendants in the contest of the union with the plaintiff, but, it appearing that no fines had been imposed and no threats of fines had been made, and the bill containing no allegations of fines or of threats of fines, it was *held* that there was no reason for such an insertion and no occasion for considering the constitutionality of St. 1911, c. 431.

BILL IN EQUITY, filed in the Superior Court on January 29, 1917, by a corporation engaged in the manufacture and installation in buildings of ornamental and other iron work against certain persons named as being officers and members of the United Housesmiths and Bridgemen's Union, No. 7, a voluntary unincorporated association, to enjoin and restrain the defendants from conspiring to prevent the plaintiff from completing a certain contract with one Crane and doing any acts in furtherance of such conspiracy, from representing in any way to owners and architects or persons in or connected with the building business that the plaintiff was on the "unfair list" or that contracts made with the plaintiff would result in trouble for the owner, architect or general contractor, and from taking any steps or action to induce other unions affiliated with the defendants to order or enter into any sympathetic strike to assist the defendants in carrying out their conspiracy against the plaintiff, and also praying that a master be appointed to ascertain the damage suffered by the plaintiff by the illegal actions of the defendants and to report his findings to the court.

The case was referred to a master who filed a report containing the findings that are stated in the opinion.

The case was heard by *Jenney,* J., upon the defendants' exceptions to the master's report, and certain of these exceptions were sustained by an interlocutory decree, from which no appeal was taken. On the same day the judge filed the following memorandum of decision:

"I am of opinion that the findings of the master that there was an implied contract between the plaintiff and the defendant union ought not to stand, and I have sustained the defendants' exceptions thereto. If I am correct in this, it follows that the master's findings of damages, so far as based on such contract, must also be disregarded.

"The only strike was upon the State House work. The plaintiff removed its men from the work at the Copley Square Hotel for reasons fully set forth by the master. As to both of these jobs, the master finds that the plaintiff is not entitled to receive damages, and in the form of decree submitted to me by the plaintiff, as that which it desires to be entered, no request is made for the inclusion of damages on account of these contracts, except as hereinafter set forth.

"The master further awards damages because of the loss of contracts which the plaintiff would have received before July 5, the date which he determines as the time when the implied contract found by him terminated. These damages are disposed of in so far as that reason for assessment is concerned, if my action is correct in sustaining the defendants' exceptions relating to the finding of an implied contract. But the plaintiff, although it has filed no exceptions to the master's report, contends that it is entitled to receive damages, on the facts found, for the loss of profits after July 5, which is, in effect, a contention that it should receive compensation for the loss of profits on contracts which it would have obtained if no differences had occurred between it and the union and provided that the members of the union had continued to work for it as in previous years. No damages are given because of 'eleven other signed contracts requiring union labor.' As to these, the master finds as follows: 'These jobs have all been suspended since May 5 because the plaintiff has been unable to get union labor unless the agreement should be signed, and because either the specific requirements of the contract, or the fact that other trades are employed on the jobs, necessitated the use of union labor, and that to endeavor to finish them with non-union labor either would not be permitted by the general contractors or would probably result in strikes.' The master also finds that: 'Although the work has been suspended, the contracts have not been taken away from the plaintiff, and that there is no means

now of determining whether it has been or will be damaged in any one of them, except in the manner described below.' The reference to the 'manner described below' apparently refers to damages which the master designates as 'shop loss', which is hereinafter considered. In any event, there was no strike as to these contracts. The work thereon was 'suspended' by the plaintiff for the reasons stated. The members of the defendant union had a right to refuse to work for the plaintiff upon these jobs unless it gave to the members of the union all of the work of the kind performed by them. As to these contracts, no facts are found entitling the plaintiff to equitable relief. . . . The plaintiff, in the form of decree presented to the court, did not ask for damages because of any loss concerning these contracts, except as to 'shop loss.'

"As to the loss of profits on 'contracts which would have been taken,' so far as they are based on the implied contract with the union, damages by reason thereof cannot be given, because the exceptions have been sustained relating to such contracts, assuming that the sustaining of the exceptions was justified. So far as the plaintiff's rights apart from contract are concerned, I think that damages cannot be recovered, because of substantially the same considerations set forth in the last paragraph, excepting the consideration arising from the form of the decree presented, which is not applicable to this matter.

"The plaintiff also claims damages because of 'shop loss' involved in the State House job and the eleven other contracts before mentioned. The master describes the loss as follows: 'I find it to be a fact that on account of the cessation of work at the State House and on the other eleven contracts above mentioned, it has been necessary to store in the plaintiff's shop the various fabricated material upon all these jobs which ordinarily would have been delivered to them as fast as completed; that a large amount of said material has accumulated already, necessitating extra handling, much inconvenience and crowded conditions at the shop, and will necessitate, if and when these contracts are proceeded with, extra labor and expense in getting the material out and transported to the various jobs.'

"The report affords no method by which to determine the amount of 'shop loss' arising from the State House job, as to which I think the strike was unlawful, separately from the loss upon

the other contracts. If I am right in my ruling that the plaintiff is not entitled to damages because of anything arising out of these contracts, it follows that no relief can be given upon the master's report because of loss of this character, because the master's findings are so made that the amount of 'shop loss' on the State House job cannot be determined therefrom.

"This disposes of all the elements of damage except as to teaming connected with the State House work. As to this, I think the plaintiff is entitled to damages as found by the master.

"A decree has been entered sustaining certain exceptions to the master's report and otherwise confirming the same, except as to rulings of law which are left open for consideration by the court upon the entry of a final decree."

Later by order of the same judge the following final decree was entered:

"This case came on to be heard after the entry of [an] interlocutory decree confirming the master's report except as set forth therein; and after hearing, and upon consideration thereof, it is ordered, adjudged and decreed that the defendants, Leonard B. Chadwick, J. A. MacDonald, Humphrey B. Sullivan, Michael Crump, Frank J. Cerconi, Neil Kelly, Oscar C. Swanson, Richard Grant, and all the officers and members of United Housesmiths and Bridgemen's Union No. 7, and each and every one of them, their agents, attorneys and servants be and are enjoined from combining and conspiring to prevent the plaintiff from completing its contract with William Crane on the State House in Boston in said county, and from doing any acts in furtherance thereof; from continuing with or instigating any strike or sympathetic strike for the purpose of compelling the plaintiff to enter into the agreement annexed to the plaintiff's bill, . . . or any agreement with the union hereinbefore named to employ none but union men; and from taking any action directly or indirectly to induce other unions affiliated with it, or other union men, to order, or enter into, any sympathetic strike for the purpose of coercing the plaintiff to enter into said agreement, or any agreement, with the defendant union to employ none but union men.

"It is further ordered, adjudged and decreed that the defendants pay to the plaintiff forty dollars' damages and one hundred and 79/100 dollars as costs of suit; and that execution issue against

the defendants, Leonard B. Chadwick, J. A. MacDonald, Humphrey B. Sullivan, Michael Crump, Frank J. Cerconi, Neil Kelly, Oscar C. Swanson and Richard Grant, in favor of the plaintiff for said amounts."

Both the plaintiff and the defendants appealed.

*E. A. Whitman,* for the plaintiff.

*F. W. Mansfield,* for the defendants.

BRALEY, J. The master's elaborate and exhaustive report states the relations of the parties as well as the economic and industrial conditions from which the present suit originated. It appears that the plaintiff, being engaged in the manufacture and installation of all kinds of wrought ornamental and other iron work and in the employment of labor at its factory, conducts "what is commonly known as an 'open shop,' which, while it means strictly that inquiries are not made of its employees as to whether or not they are members of a union, nevertheless under present day conditions, results in all the employees being non-union men." But, in performance of the contract with one Crane into which it entered as described in the bill, the plaintiff, having been on friendly terms with the union, and in accordance with its custom for several years to employ "union men on certain outside jobs, so that about one half of its outside work has, in fact, been done by union men, at least for the last three years, such union men being members" of the defendants' unincorporated organization, hired the defendants Swanson, Gustafson, McDonough, Grant, Husband, Crane, Muldoon and Brennan, who formed part of its working force of twenty men. While the work was proceeding satisfactorily and without any complaint from the union employees as to the rate and time of payment of wages, the number of hours of labor required, or that non-union men also had been employed and retained, the union, having by vote instructed its secretary "to send out new proposed agreements to all the contractors in their line," passed a further vote instructing its business agent that "no member be allowed to work for unfair firms until they had been signed up by business agent." A conference shortly after followed between the plaintiff and the union's business agent, the defendant Chadwick, when the plaintiff declined to sign the agreement, and no settlement was reached. The master reports that while other provisions appeared, the agreement "was

intended to mean and would have been [*sic*] meant that the employer signing it agreed not to employ non-union labor on any of his outside jobs during the period of the agreement. It had no reference to the inside or shop work." What followed is thus stated in the report: "While the matter was . . . under discussion and with no specific notice . . . that the plaintiff's men would be interfered with . . . , or that they would themselves cease to work, I find that . . . the eight defendants . . . without warning or notice to the plaintiff . . . left the work," which was "about two thirds completed." It is found that "this leaving of these eight defendants . . . was, and was by them and the union intended to be as a strike; that it was in consequence of the vote of the union and the advice or suggestions of Chadwick, in which advice or suggestions I find that he was carrying out the wishes and expectations of the union." If the right of the employees to cease work of their own volition is unquestioned, the object or motive for which the strike was precipitated is a question of fact. If the master's subsidiary findings only were to be considered, it is settled that a strike would not be unlawful if upon ascertaining that they could not have all, they declined to take part of the work. *Pickett* v. *Walsh*, 192 Mass. 572. But these findings as they appear in the report are made subordinate to the express findings, "that the purposes of this strike were primarily to compel the plaintiff to sign the agreement . . . which among other things . . . would have required it to unionize its outside work," and "the reason . . . that the plaintiff was singled out as the first point of attack in the efforts of the union to induce open shop contractors to sign the agreement, was chiefly that the work upon which the plaintiff was engaged was easily the best and most notorious in Boston at that time. I find that the union believed that if the plaintiff could be compelled to sign this agreement, it would bring many of the other forty open shop contractors into line. It is also probably true that the plaintiff was thus singled out because it was one of the two open shop contractors who had definitely refused to sign the agreement. I do not find that the purpose of the union was to injure the plaintiff, but I am of the opinion that the union was entirely indifferent as to whether it did or not." It is further decided, although the union never sent out any list called an "unfair list," "that Chadwick intended the plaintiff to understand that upon such list as the union

was in the habit of sending out it would be made to appear to architects and contractors that the union did not consider the plaintiff or other contractors as fair contractors unless in the meantime they had signed this agreement." The purpose of the strike is restated, and the participation of the union of which Chadwick was the mouthpiece is set forth in these words: "I find that if the plaintiff would sign the agreement it would be furnished with all union men necessary for all of its work, but that, unless and until it does so, it is the intention of the union to refuse to let any of their men work on any of its jobs, in which intention, so far as appears, the individual members of the union concur." It is now plain that the paramount motive actuating all the proceedings of the defendants and their fellow members was by means of the strike to force the plaintiff to employ only union men on all of its "outside work" under the penalty if compliance was refused, that full performance of the contract with Crane would be seriously embarrassed if not rendered impossible, while its name would be published by the union in the labor market, and among architects and contractors for its products as an employer of non-union labor, making the obtainment of future contracts and the necessary union labor exceedingly precarious if not practically impossible. The right of the plaintiff to the benefit of its contract and to remain undisturbed by the union during performance, as well as to hire and retain such employees as it might select unhampered by the interference of the union acting as a body through the instrumentality of a strike or of a secondary boycott or black list, is a primary right which has not been abrogated by any of our decisions. "An intentional interference with such a right, without lawful justification, is malicious in law, even if it is from good motives and without express malice." *Berry* v. *Donovan*, 188 Mass. 353, 355, 356. *Reynolds* v. *Davis*, 198 Mass. 294. *Folsom* v. *Lewis*, 208 Mass. 336. *Burnham* v. *Dowd*, 217 Mass. 351. *Cornellier* v. *Haverhill Shoe Manufacturers' Association*, 221 Mass. 554. *Shinsky* v. *Tracey*, 226 Mass. 21.

While the plaintiff is entitled to injunctive relief accordingly, the question of damages remains. The plaintiff took no exceptions to the report, and by the interlocutory decree from which neither party appealed the defendants' forty-first, fifty-first, fifty-second, fifty-third, fifty-fifth, fifty-sixth, fifty-eighth and fifty-ninth ex-

ceptions were sustained, and the report confirmed, "except in so far as it contains rulings of law, said rulings not being confirmed but left open for consideration upon the entry of the final decree." It follows that none of the defendants' remaining exceptions are open on their appeal, and the plaintiff's damages are to be ascertained from the report, and the memorandum of decision and order for decree of the trial judge. The scope of the bill cannot be enlarged by the specific prayers for relief, or the general prayer which although not inserted is read in by force of the statute. *Fordyce* v. *Dillaway*, 212 Mass. 404. R. L. c. 159, § 12.

The eighth paragraph of the bill alleges that, if the union persists in its hostility, "it would be very difficult if not impossible, for your orator to get work, and much work which might be otherwise open to it will be rendered impossible, and that said conduct has caused damage to your orator to the amount of $10,000 . . . which will be made to appear upon the trial of this cause, with other due damage." It is to be gathered from the report that the plaintiff sought to establish and relied upon an agreement that the union as a voluntary body had promised and engaged to provide union labor to the amount the plaintiff needed on any of its outside contracts under the condition that non-union labor should be concurrently employed as the plaintiff might determine. No express contract was ever made.

The master acted within his province in making such rulings of law as he deemed necessary for a full trial of the issues raised by the pleadings. *Bradley* v. *Borden*, 223 Mass. 575. But his finding, which is and was intended to be a conclusion or ruling of law, that an implied contract existed between the plaintiff and the union whereby the union understood and constructively agreed that it would furnish union labor on outside work whenever required cannot be sustained. It is true that, in the absence of an express agreement between them, an implied contract from the conduct and relations of the parties may be found to exist. *Hayes* v. *Philadelphia* & *Reading Coal* & *Iron Co.* 150 Mass. 457. It cannot be found to exist, however, unless a contract status is shown. The officers of the union could not create either by word or conduct a binding bargain in behalf of the members of their union to furnish labor to be performed individually, unless they had been authorized expressly or impliedly by the members in some

form sufficient to show mutuality of will and consent.  The "custom and practice" of furnishing men when the plaintiff communicated its needs directly or by its foreman, the defendant Husband, to the responsible officers of the union, even if known to the union and never formally disapproved, did not constitute a contract for breach of which damages could be recovered or specific performance enforced by either party.  *Newell* v. *Borden,* 128 Mass. 31.  *McFadden* v. *Murphy,* 149 Mass. 341.  *Tracey* v. *Osborne,* 226 Mass. 25.  There having been no evidence that any concerted action recognizing such an obligation had ever been taken by the union at any of the meetings, or that individual members possessed full knowledge of the circumstances, or that the "responsible officers" had ever been authorized expressly or by fair implication to take such action, the damages, if any, resulting from the loss of the contracts which the plaintiff made if obtained before the date which the master finds was the time when the implied contract terminated, need not be considered.

The master's denial of damages for loss of profits on eleven contracts which the plaintiff would have taken if its amicable relations with the union had continued and its members had remained in the plaintiff's employment, while not excepted to, is manifestly right, as the members lawfully could refuse of their own volition to work for the plaintiff.  *Pickett* v. *Walsh,* 192 Mass. 572.

A further claim is made for "shop loss" arising under the Crane contract and the eleven contracts, on the ground, that, by "the cessation of work at the State House and on the other eleven contracts above mentioned," it has been necessary to store in the plaintiff's shop the various fabricated material upon all these jobs which ordinarily would have been delivered to them as fast as completed; that a large amount of such material has accumulated already, necessitating extra handling, much inconvenience and crowded conditions at the shop, and will necessitate, if and when these contracts are proceeded with, extra labor and expense in getting the material out and transported to the various jobs."  And the master awards a very substantial lump sum for the consequent loss.  The plaintiff however cannot recover for "shop loss" suffered under the other contracts for reasons already stated, and, while entitled to such loss under the

Crane contract, the amount cannot be ascertained from the report. If the plaintiff deemed the matter of sufficient importance, it should have moved for a recommittal.

It also is urged that the decree should contain a clause forbidding the imposition of fines and penalties as a mode of enforcing the purpose of the union in its contest with the plaintiff. But, no fines having been imposed or any threats made that their imposition is intended, and the bill not containing any allegations thereof, we find no reason for the modification. *Aberthaw Construction Co.* v. *Cameron*, 194 Mass. 208, 215. It moreover is to be presumed that the defendants will not act unlawfully in the future, and any discussion of the constitutionality of the St. of 1911, c. 431, would not be germane to the questions raised by the pleadings and the report. *Aberthaw Construction Co.* v. *Cameron*, 194 Mass. 208, 215.

It results that the decree for the plaintiff should be affirmed with costs.

<div align="right">

*Ordered accordingly.*